UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN
_____

BRIAN MASCK,

                        Plaintiff,

                                                            File No.

v                                                           Hon.

SPORTS ILLUSTRATED;
NISSAN NORTH AMERICA;
GETTY IMAGES, INC.;
CHAMPIONS PRESS, L.L.C.;
DESMOND HOWARD;
PHOTO FILE, INC.;
FATHEAD, L.L.C.;
WAL-MART STORES, INC;
WAL-MART.COM USA, L.L.C and
AMAZON.COM, INC.,

                        Defendant.
_____

Thomas H. Blaske (P26760)
John F. Turck IV (P67670)
BLASKE & BLASKE, P.L.C.
Attorneys for Plaintiff
500 South Main Street
Ann Arbor, Michigan 48104
(734) 747-7055

# **COMPLAINT**

Plaintiff Brian Masck, by and through his attorneys, Blaske & Blaske, P.L.C., for his Complaint says:

## PARTIES AND JURISDICTION

1.  Plaintiff Brian Masck is a resident of Genesee County, Michigan and conducts business within the State of Michigan.

2.  Defendant Sports Illustrated ("SI"), is a company owned by Time, Inc., with its principal place of business at 135 West 50th Street, New York, New York 10020, and conducts substantial business within the State of Michigan.

3.  SI operates, maintains and controls the web sites *Sportsillustrated.CNN.com* ("*SI.com*") and *SIKids.com*. Sports Illustrated supervises and controls all information contained on its web sites *SI.com* and *SIKids.com*.

4.  Defendant Nissan North America, Inc. ("Nissan"), with its principal place of business at One Nissan Way, Franklin, Tennessee 37067, conducts substantial business within the State of Michigan.

5.  Defendant Getty Images, Inc. ("Getty"), with its principal place of business at 605 5th Avenue South, Suite 400 Seattle, WA 98104, conducts substantial business within the State of Michigan.

6.  Getty operates, maintains, and controls the web site *Gettyimages.com*. Getty supervises and controls all information contained on its web site *Gettyimages.com*.

7.  Defendant Champions Press, L.L.C. ("Champions Press"), with its principal place of business at 30230 Manhattan Street, Saint Clair Shores, Michigan 48082, is a Michigan corporation which conducts substantial business within the State of Michigan.

8.     Defendant Desmond Howard, believed to now be a resident of the State of Florida, conducts substantial business within the State of Michigan.

9.     Desmond Howard operates, maintains and controls the web site *Desmondhoward.com*. Desmond Howard supervises and controls all information contained on his web site *Desmondhoward.com*.

10.    Defendant Photo File, Inc. ("Photo File"), with its principal place of business at 333 North Bedford Road, Suite 130, Mount Kisco, New York 10549, conducts substantial business within the State of Michigan.

11.    Photo File operates, maintains, and controls the web site *Photofile.com*. Photo File supervises and controls all information contained on its web site.

12.    Defendant Fathead, LLC. ("Fathead"), with its principal place of business at 1046 Woodward Avenue, Detroit, Michigan 48226, is a Delaware company presently in the midst of a planned move to Michigan, and it conducts substantial business within the State of Michigan.

13.    Fathead operates, maintains, and controls the web site Fathead.com. Fathead supervises and controls all information contained on its web site.

14.    Defendants Wal-Mart Stores, Inc. and Wal-Mart.com USA, L.L.C. ("Walmart"), with their principal places of business at 702 SW Eighth Street, Bentonville, Arkansas 72716, both conduct substantial business within the State of Michigan.

15.    Walmart operates, maintains, and controls as its subsidiary the web site *Walmart.com*. Walmart supervises and controls all information contained on its web site *Walmart.com*.

16. Defendant Amazon.com, Inc. ("Amazon"), with its principal place of business at 1200 Twelfth Avenue, South Suite 1200, Seattle, Washington 98144, conducts substantial business within the State of Michigan.

17. Amazon operates, maintains, and controls the web site *Amazon.com*. Amazon supervises and controls all information contained on its web site *Amazon.com.*

18. This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a), and 1338(b) as, among others, Plaintiff brings claims under the Copyright Act, 17 U.S.C. § 101, *et seq*., and the Lanham Act, 15 U.S.C. § 1051, *et seq*.

19. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

20. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims made herein occurred in the Eastern District of the State of Michigan <u>and</u> because the events giving rise to the claim significantly impacted business in the Eastern District of the State of Michigan.

21. Venue also is proper under 28 U.S.C. §1391(b)(3) because, if no single District exists in which an action may otherwise be brought, Defendants Champions Press and Fathead reside in the Eastern District of Michigan and are subject to personal jurisdiction of this Court.

## STATEMENT OF THE CASE

22. The Desmond Howard Heisman Pose photograph ("Heisman Pose photo"), taken by plaintiff Brian Masck on November 23, 1991, is one of the most famous photos ever taken of a college athlete. The photograph is synonymous with college football and even has

touched off a cultural phenomenon -- striking the "Heisman pose." If you search Google Images for "Heisman pose," the result brings up thousands of pictures – including President Obama striking the Heisman pose[1] – but the first is Brian Masck's Desmond Howard Heisman Pose photo, even before any images of the actual Heisman Trophy itself.



*Brian Masck's 1991 Desmond Howard Heisman Pose photograph*

23.     With one leg lifted off the ground, Desmond Howard's pose in Masck's famous photograph is somewhat different from the actual stance of the football player depicted in the Heisman Trophy, but most people recreate Howard's stance when they are striking the Heisman pose. Indeed, even President Obama's pose is closer to Howard's stance, despite the fact that when he posed the President was holding the actual Heisman Trophy in his

---

[1]     See below for a photograph of President Obama and others striking the Desmond Howard Heisman Trophy pose.

hands. President Obama probably does not know it, but, like so many others, he has been influenced by Brian Masck's photograph of Desmond Howard's Heisman pose.

24. It is the ultimate achievement of a professional photographer's career to have one of his pictures known around the world as a definitive image, as a cultural touchstone. Brian Masck's Heisman Pose photo is iconic. As a digital image, it has gone viral. But few people know that Brian Masck took that photograph, which saddens him. And many companies have made and continue to make money using the photograph without credit or compensation to Brian Masck, even those, like Defendants, which know or should know that he took it, which disappoints him.

25. Brian Masck is proud of his work. He is happy that people appreciate and want to use his photo. And he knows that, in this digital age, he cannot put the genie back in the bottle and completely remove his photograph from the Internet. However, it is within his abilities, and it is his right, to insist through the power of this Court that those who are going to profit from the use of his photograph are held accountable for their actions and provide him both the credit and the compensation he is due.

### The Making of the "Heisman Pose" Photograph

26. On November 23, 1991 Brian Masck was an experienced professional photographer.

27. As a child growing up in Grand Rapids, Michigan, Brian Masck, who was born in 1962, started taking pictures in the third grade. He was inspired by the photography of his father, Edward C. Masck, who took pictures while serving in World War II – in the California desert and at famous sites in Italy. When Brian was a child, his father built a makeshift darkroom in the basement, and Brian's brother took up photography, too. Brian began

bringing a camera to school every day, took pictures for his church, and entered photos in his home city's annual art exhibit. In high school, he did some freelance photography for the *Grand Rapids Press*. Of photography, says Brian today, "It's just what I do."

28.     In that pre-digital era, he enjoyed the physical act of producing a photograph. He liked to set up the trays and chemicals, watch the image appear, adjust the exposure with his hands, and try different kinds of emulsions and papers to produce different effects. When he headed to college at the University of Michigan in 1980, he started his studies in the art school.

29.     But after he got involved with the *Michigan Daily* (the student newspaper on campus) and the *Michiganensian* (the yearbook), Brian began to lean toward photojournalism. Then, at the end of his freshman year, on April 18, 1981, he took a photograph that changed the course of his life.

30.     Early that morning, Brian was asleep in his dormitory room in Bursley Hall on North Campus, when he heard the fire alarm. He grabbed a camera as he left the building, and he ended up getting a shot of Leo Kelly, Jr. as he was being escorted away from the dorm in handcuffs. Kelly, a fellow student and Bursley Hall resident, had just shot and killed two students in the dorm.



*Brian Masck's 1981 photograph of Leo Kelly Jr. outside Bursley Hall, University of Michigan*

31.     The crime made national news and, in hindsight, can be seen as one of the earliest of senseless campus shootings. Kelly threw a Molotov cocktail into a hallway and waited with a shotgun to shoot whatever students emerged when the fire alarm sounded. Afterward, Kelly simply sat in his dorm room until police arrived. Masck, who had already learned to take his camera with him everywhere, was the only photographer on site when Kelly was arrested.  And that is why he was able to sell his photograph to the national media.

32.     At later meetings of the affected students, organized by the University, Masck heard himself called a villain for allegedly profiting from the tragedy by selling a picture of the perpetrator. He heard his actions called unethical and unconscionable. These reactions stunned him. Just like his fellow students, Brian was shaken by the incident. He was not immune from its horror. But he also saw a story that needed to be told, and he told it in his way, with his camera.  He realized then that he was a photojournalist.

33.     The University of Michigan did not offer a journalism major at that time, so Masck studied for and was awarded a degree in General Studies with a focus on economics and sociology, all the while continuing to take pictures everywhere he went. For example, he had a camera with him in Columbus, Ohio, the night before the 1982 Michigan/Ohio State football game. He was there to cover the game for the *Michigan Daily* when he witnessed local police officers becoming violent with someone on the street. When Brian refused to stop taking pictures of the incident, he was arrested, along with the *Daily's* editor, who was protesting Brian's arrest. All charges were eventually dropped, but you could say Brian, who had just turned 20 years old, was earning his photojournalism credentials.

34.     Taking pictures of sports was a regular assignment for Brian in college. "I always liked shooting sports. I was good at it. I had good timing. I sat in the Michigan Stadium stands only once as a student. Every other time I was in Michigan Stadium, I was on the field." He worked most of those Saturdays during football season, either for the *Michigan Daily*, the *Michiganensian*, the *Ann Arbor News*, or the University of Michigan Athletic Department.

35.     After college, Brian moved to Muskegon to become a full-time staff photographer at the *Muskegon Chronicle*. He worked there Monday through Friday, taking whatever assignments his editors gave him. On weekends, on his own time, with the full knowledge and consent of the *Chronicle*, he continued to shoot sports throughout the Midwest, looking to build up his personal portfolio. He shot college football on Saturdays – primarily at Michigan, Michigan State, or Notre Dame – and pro football on Sundays, usually driving to Detroit, Cleveland, Chicago, Green Bay, Cincinnati, or Pittsburgh.

36.     He often went to these games as a freelancer, using his *Muskegon Chronicle* press credential to get on the field.  This was an accepted practice at the paper.  All the journalists there understood and knew that, if the newspaper was not already covering an event, they could use their credentials to attend, and if they got something good, they could perhaps offer it to the paper or to some other place of publication.  The editors at the *Chronicle* saw this as a way of building the skills of their staff, and if someone from their paper got a byline in a national magazine like *Sports Illustrated*, that was also a benefit to the newspaper.

37.    By the time Brian shot the famous Desmond Howard Heisman Pose photo in 1991, he had been taking pictures professionally for more than ten years. He well understood that great photos come from being prepared, being present, being thoughtful and being bold.

**By November 23, 1991, Brian Masck was a respected freelance sports photographer.**

38.    As Brian attempted to build his freelance sports photography into a more sustaining business, he purchased sports specialty photography equipment, built a darkroom in his home, and began to cultivate relationships with national media. "I was more aggressive in my freelance," says Brian, "than many other photographers, who saw weekend sports photography as a sideline to their full-time jobs."  He did not.

39.    Freelance sports photography is and was a complicated business, with many variations:

A.    Sometimes Brian attended a game on his own initiative, and if he was able to sell one of his photos directly to a magazine, he got sole credit for that picture.

B.    Sometimes Brian was hired by a magazine or newspaper in advance of a game to shoot the game; in that case, the hiring magazine/newspaper shared the photo credit with him on everything that magazine/newspaper published.

C.    Sometimes Brian attended the game on his own and then offered a resulting image, in the form of a slide, to the sports photo agency, for example Allsport USA, a middleman that resold photos to media outlets. If Allsport was in turn able to get one of Brian's pictures published in a magazine or newspaper, Brian shared the photo credit with Allsport.

D.    Sometimes Brian was hired by Allsport in advance of a game. In that situation, Allsport paid him a day rate and covered his expenses, and he sent Allsport all the

film he took that day. Allsport then developed the film, chose which photos to try to sell to the media, and shared photo credit with Brian.

40.    By 1991, Brian had been building his freelance business for five years. His work had been published in newspapers throughout the country, in pre-season preview reports, and in *Sports Illustrated*. A photo he took at a Detroit Lions game won a Pro Football Hall of Fame contest and is still on display at the Hall of Fame in Canton, Ohio. Allsport USA paid for his pictures a few times a season. And *Sports Illustrated* called him on occasion, asking him to supplement the work of its staff photographer who would also be covering a game. "When *Sports Illustrated* is calling *you*, you know that's a milestone," says Brian. "By then, I was trying to decide if I wanted to go full-time with sports photography or stay in journalism."

**On November 23, 1991, Desmond Howard was a favorite for the Heisman Trophy.**

41.    When Desmond Howard arrived on the University of Michigan campus in the fall of 1989, he was a high school football, basketball, and track star from Cleveland, Ohio, with a promising future as a receiver for the Wolverines. By the fall of his junior year at Michigan, he was a college football superstar.

42.    He was about to become a college football icon.

43.    During the second game of the 1991 season, against Notre Dame, Howard made a stunning fourth quarter, fourth down touchdown reception which became known simply as "The Catch." Outrunning two opponents into the end zone, Howard went airborne, horizontally over the ground, as the passed football dropped into his outstretched arms. The Catch assured the Wolverines' victory and ended a four-game losing streak against the Fighting

Irish. Although the season was just getting started, experts began seriously mentioning Howard as a potential candidate for that season's Heisman Trophy.

44.     The Heisman Trophy, first awarded in 1935, is the highest honor in college football and, as such, is the most notable award in American collegiate athletics. Named after legendary college football coach John Heisman, the trophy is awarded each December to an individual considered the most outstanding college football player in the United States. The winner is chosen by a ballot of selected sports journalists and former Heisman winners. A player who wins the Heisman also brings glory to his school, which is awarded a second trophy.

45.     The trophy itself is unlike anything else in college sports. The 45-pound bronze statue, designed by sculptor Frank Eliscu, is a lifelike depiction of a football player cradling the ball in his left hand while side-stepping and straight-arming an imaginary tackler. The player's old-fashioned helmet and lack of shoulder pads are reminders of the long history of the Heisman Trophy itself, but the pose of the player is pure football in any era.

46.     Before 1991, only one University of Michigan player (Tom Harmon in 1940) had won the Heisman Trophy. By November 1991, with Desmond Howard setting records left and right and getting much-deserved national media coverage, that a second University of Michigan player might become a Heisman Trophy winner was a promising prediction. Under head coach Gary Moeller, the 1991 Wolverines were undefeated in the Big Ten (having lost only one game in the non-conference season, to No. 1-ranked Florida State), and Howard was about to become the first receiver in Big Ten history to lead the conference in scoring. Nationally, he was second in scoring and punt returns, and tenth in receiving.

47.   But much more than his records was Desmond Howard's electrifying personality and performance. He wasn't a big player – just 5'10" tall and 170 pounds light – but he used that slight build to his advantage as he outran opponents, leaped high off the field to catch passes, and seemed to come out of nowhere to complete jaw-dropping plays.  And he enjoyed himself, speaking often about his joy in the game and in college life itself.

48.   As Michigan and Ohio State fans converged on Michigan Stadium on November 23, 1991, for the last game of the regular season, Desmond Howard was on everybody's minds.  He sure was on Brian Masck's mind.

**On November 23, 1991, Brian Masck got the shot of a lifetime.**

49.   That morning, Brian Masck drove from Muskegon to Saginaw to pick up fellow photographer Jeff Schrier. No publication had hired either freelancer to cover the game that day, but Schrier was to use a *Saginaw News* press pass, and Masck had his usual *Muskegon Chronicle* pass. Rain threatened as they drove to Ann Arbor.

50.   They talked about what they expected in the game and how they would cover it. They agreed that, because they were not working for anybody that day and no editor would be asking them for an image of each play, they did not have to be on every snap; and they would not have to position themselves on the line of scrimmage. Brian remembers, "We had looked at the history of the Ohio State-Michigan games. We looked at how they were playing that season. We said that big plays are going to tell the story of this game."

51.   They both thought those big plays which would decide the game were probably going to come from Desmond Howard. The two photographers saw the potential for Howard to break free at some point in the game. They also knew Howard was being talked about as

the lead candidate for the Heisman Trophy, and they knew that if he did really well in the game, such a performance would likely seal his bid for the Trophy and, to a certain extent, his everlasting fame.

52.    Little did either of them anticipate before the game that the foresight, perceptive planning and skill of one of them would facilitate the creation of a college football icon, let alone a broader cultural touchstone.

53.    As the game got underway, Brian and Jeff stuck to their strategy. "We played way ahead of the line of scrimmage, of all the action, because if somebody breaks a big play, that's what's going to be important. And it paid off."

54.    With just over four minutes to go in the second quarter of the game, Desmond Howard caught a punt, dodged several defenders, and ran 93 yards for a touchdown. It was the longest punt return in Wolverine history. With 20 yards to go, he knew he was free, and he held his right hand in the air. The fans in Michigan Stadium cheered wildly as Howard crossed into the end zone. Those watching on television heard ABC sportscaster Keith Jackson say, as only he could, "G-o-o-d-b-y-e . . . . . . . H-e-l-l-o, Heisman!"

55.    Before any players caught up with him, Howard stopped in the end zone, looked toward the stands beyond the goalpost, grinned, took the football in his right hand, bent his left leg, and straightened his left arm out to the side, with his hand lifted in a "stop" position. His was not an exact recreation of the Heisman Trophy, but it was similar enough to be recognized instantly by fans and announcers alike as "the Heisman pose."

56.    Howard's pose lasted less than a second. He never even really stopped moving or fully regained his balance in the pose before happy teammates grabbed him in celebration.

57.     But Brian Masck got the shot.   Only Brian Masck got the shot.

58.     Even though the punt occurred near the 50-yard line, and the catch occurred near the north end zone, Brian had positioned himself at the other end of the field, near the southwest corner of the south end zone. When Howard arrived to score the touchdown, Brian was there to capture the moment. And the moment he captured was the Heisman Trophy pose. "There's one frame of this," says Brian. "That was my one shot. And it was sharp."

59.     Brian was photographing the game with a motor-driven Nikon F3, but he did not motor-drive the touchdown to take as many frames per second as the camera would allow. Instead, he manually focused the camera to take each of his shots. Brian explains, "Putting your finger on the motor drive and letting the camera go doesn't make a good picture. A dozen out-of-focus pictures don't do you any good. You gotta be able to focus. . . This [shot] was manually focused. . . The camera was not that fast, and it was a cold day, so the camera was slower yet, because the batteries don't work as well and everything slows down in colder weather. . . Cameras now are practically video cameras with [up to 10 frames per] second, but we weren't there in 1991."

60.     Jeff Schrier also got somewhat of a shot of Howard's Heisman Pose, but from a different angle. Jeff was standing about 15 yards from Brian, near the ten yard line. Another professional photographer, Chris Covatta, hired by Getty Images, also photographed the moment. However, no other in the small legion of photographers at the game were then positioned on that south end of the field. "After we made this picture," says Brian, "Jeff and I looked toward the north end of the stadium, and we see forty photographers, as a herd, running this way."

61.    Even with the excitement of the big play and his excellent location from which to  shoot it, at the time Brian did not imagine that he had just taken one of college football's most iconic images. In fact, he did not at first recognize the Heisman Trophy pose for what it was. He remembers thinking the pose was "kind of a weird celebration. Usually they do something else." In previous games, Howard's typical celebratory stance after a touchdown was to face the stands, feet apart, up on his toes, with the football held aloft in one hand, waiting for his teammates to come celebrate with him.

62.    Brian and Jeff left Michigan Stadium that day sometime during the second half because they were worried about near-continuous rain damaging their cameras. Because no one had hired them to cover the game, they did not need to stay to the end of what turned into a welcome rout, with Michigan beating Ohio State by a final score of 31-3. While they were driving back toward Saginaw, they heard on the car radio about Howard striking the Heisman Trophy pose. They both hoped they had gotten that shot.

63.    Brian developed his film when he returned home to Muskegon on Sunday. He unrolled the transparency slide film (which was in color, not a negative image). While it was still wet, he held his film up to the light to take a look. He could see right away that he had gotten the Heisman pose. He then grabbed a magnifier to see if the image was sharp. That moment is when Brian felt it in his gut: "This is a big deal," he thought. "Howard is joyously imitating the Heisman Trophy that he's going to win. This is a hot picture." That picture appears immediately below.



*Brian Masck's 1991 Desmond Howard Heisman Pose photograph*

64. Brian's photo not only caught Howard's entire body striking the pose, but the angle from which Brian's picture was taken captured what the others did not – the joyful grin on Howard's face, looking even just a bit mischievous, as though he and all who saw him were in on the joy and celebration, and even the laughter, of the priceless moment.

65. Jeff Shrier also caught the pose with his camera, but from an angle that did not get the full facial expression, cut off one of Howard's feet, and simply does not have the same energy and style. Similarly, Chris Covatta's picture from Howard's opposite side cuts off the outstretched hand, shows almost none of the face, and does not really give that same sense of a famous pose being struck. Brian had by far the best shot – really the only shot -- as Jeff

quickly acknowledged, even agreeing not to compete with Brian in trying to sell the picture nationally, and he has never done so.



*Jeff Schrier's 1991 Heisman Pose photograph*



*Chris Covatta's 1991 Heisman Pose photograph*

66.  Nonetheless, there at that moment in his darkroom, even in his excitement over the shot, Brian never would have guessed that his photo would become the very big deal it is today. He could not have imagined, for example, that respected sports journalist John U. Bacon would one day call the image "One of the most famous photos in football history."

67.  "You don't know that this is going to go viral in the future," Brian points out.  He just knew that, as a sports photographer trying to advance his career, he was holding in his hands the definitive image of that year's college football season.

**On December 9, 1991, Brian Masck's Heisman Pose photo
was published worldwide in *Sports Illustrated*.**

68.  Brian Masck called *Sports Illustrated* that same Sunday after the game. If the magazine's editors wanted to publish his picture in its next issue, time was of the essence. In those days, before digital imaging, a picture had to be physically delivered from one hand to the

next, so if *SI* wanted the picture right away, Brian would need to package the transparency slide and drive it out to the airport for overnight delivery. The magazine's college football photo editor, Jeff Weig, decided they would not run Brian's picture in the next issue, so there was no need for a quick airport trip, but *SI* would like to prospect it for a Heisman preview issue, due out in early December.

61.    Before Brian sent the slide to *Sports Illustrated*, he made a 4 x 5 negative copy of the picture which he intended to use later to produce prints of his picture. This was a step he would not normally take in his work, but Brian was already thinking he could sell prints of such an image, and he wanted to be sure to have a backup if anything should happen to his slide while it was at the magazine. (Brian knew that slides often sustained minor damage in the magazine production process.) With the negative safely in his hands, Brian pasted a typed label onto the slide's cardboard mount stating "Photo © 1991 by Brian Masck", dropped the slide into a plastic sleeve, inserted his business card, and shipped that package off to *Sports Illustrated*.

62.    The cover of *Sports Illustrated's* Heisman Trophy preview issue, dated December 9, 1991, shows a picture of Desmond Howard running down the field under the headline "Runaway." The editors chose two of Masck's photos to accompany the article on the inside of the magazine:

A.    On page 91, Howard is shown in the midst of a diving catch with the photo by-line correctly credited to "Brian Masck/Allsport USA."



*Sports Illustrated's publication of Brian Masck/Allsport USA's Diving Catch photograph (December 9, 1991 issue)*

B.   On page 92, Masck's Desmond Howard Heisman Pose photo appears, with the photo byline accurately credited to "Brian Masck."



*Sports Illustrated's publication of Brian Masck's Heisman Pose photograph (December 9, 1991 issue)*

69.   The first photo credited to him was taken by Brian when he was hired by Allsport to cover the Michigan-Michigan State game; thus, they apparently shared the photo credit. Because no one had hired Masck to cover the Michigan-Ohio State game, and because he had sold

the resulting picture directly to *Sports Illustrated* without using a middleman like Allsport, Brian did not have to share credit with anyone for his Heisman Pose photo. The image – and the byline credit – were his and his alone.

70. Masck never provided a slide of the Heisman Pose photo to Allsport. He never sent the slide to anyone or any entity other than *Sports Illustrated*. The magazine paid him approximately $500[2] for the one-time use of his Heisman Pose photograph in its December 9 issue.  As sometimes happened, *Sports Illustrated* never returned his slide of his Heisman Pose photo to Brian. He did not ask for its return, because he hoped the magazine might run the photo again in a future issue, perhaps for a cover, or special edition, or when Desmond Howard was drafted into the National Football League. Besides, Brian had the negative print he had already made, which negative would be just as useful to him in producing high-quality prints of the photo for his other business purposes.

71. In 1992, Brian Masck hired Warner Norcross and Judd to advise him regarding the protection of his photograph. His counsel at that time advised him that, because *Sports Illustrated* had published the photograph and correctly credited it to him in the accompanying byline, his photograph would be fully protected by copyright law. Of course, this was before the advent of the internet and digital scanners. Brian had a negative of the photograph, correct attribution in *Sports Illustrated*, and his counsel had advised him that he was protected by copyright. Consequently, Brian did not register his Desmond Howard Heisman Pose photograph with the Copyright Office at that time.

---

[2]    Brian just does not remember the exact amount.

**In the 1990s, Brian Masck sold a limited number of prints
he had made of his Heisman Pose photo.**

72.    In 1991 and for a few years afterward, Brian himself produced a limited number of prints
(in various sizes) of the Desmond Howard Heisman Pose photo for his personal use as a
business product. He sold some prints to M-Den (an official University of Michigan
memorabilia and athletic clothing store) and some few to other stores that carried
University of Michigan merchandise. The stores typically framed the prints and resold
them to customers.

73.    As an experienced professional photographer, Brian understood that the value of most
well-known photographs follows a fairly predictable curve – with high value immediately
after the event followed by a steep drop in value after initial interest wanes, and then a slow
rise in value as -- and if -- the image becomes historically or culturally significant. Brian
stopped selling the prints a few years after Desmond Howard went pro in order to limit the
total number of Heisman Pose prints in the marketplace, with the expectation and hope and
belief that prints of his photo would be worth much more in the future.

**In 1992, Brian Masck gave a print to the University of Michigan Athletic Department.**

74.    Brian enjoyed a good relationship with the University of Michigan Athletic Department
and its public relations staff. In appreciation, he produced and presented a 16" x 20" framed
print of the Heisman Pose photo as a gift to the U-M Athletic Department.

**Desmond Howard went on to have a successful career in pro football.**

75.     If Desmond Howard had failed to win the Heisman Trophy, or had left college and moved on to a life of obscurity, Brian's photograph might not have had too much life beyond the 1991 football season. But that is obviously not what transpired.

76.     Howard did, in fact, win the Heisman Trophy in 1991, by the then-second largest margin of victory (85% of the first place votes) in the Trophy's history. That same year, Howard was also a unanimous All-America selection, won the Maxwell Award (another "best football player" award), and became the Walter Camp Player of the Year.

77.     Howard was the fourth pick in the 1992 National Football League draft and went on to play professional football for eleven years. He was chosen Super Bowl XXXI's Most Valuable Player ("MVP") in 1996 as a member of the Green Bay Packers, and is one of only four men (the others being Roger Staubach, Jim Plunkett, and Marcus Allen) to win the Heisman Trophy and a Super Bowl MVP.

78.     In 2005, Desmond Howard joined television network ESPN as a college football analyst and member of the College GameDay broadcast crew. In 2010, he was elected to the College Football Hall of Fame.

**Brian Masck's Heisman Pose photograph is a work of art protected by U.S. copyright laws.**

79.     When Brian Masck clicked his camera on November 23, 1991, all of his choices culminated in an original and creative work of authorship fixed in a tangible medium of expression. His choice of camera equipment and film, his decision to attend the game, his understanding of how to tell a story of a football game, his knowledge of this rivalry and players, his choice to shoot from the south end zone, the shutter speed he used, the

successful manual focus, his choice of when to snap open the shutter of his camera, his knowledge of how to develop the film – all of this knowledge, skill, experience, and artistry went into the making of his iconic image.

80.     From November 23, 1991 to and through the present day, Brian Masck has owned the copyright on this work. He never sold his copyright of this work.

81.     On or about 1998, Getty Images purchased a collection of images from Allsport USA. For each image, Getty purchased either the copyright or the right to license.

82.     Some of Brian Masck's sports photographs that were produced in connection with Allsport were included in this collection. There is no reason to believe hist the Heisman Pose photo was included in this collection, because Brian never sold or gave a transparency slide or print of the photograph to Allsport USA.

83.     On March 13, 2002 Getty Images, after uploading slides to its digital database, returned to Brian Masck a set of his original photography slides that Getty had acquired from Allsport.

84.     These were the slides of the photographs that Brian Masck had shot as a freelance photographer contracting with Allsport. Getty Images did not return the original, nor any other copy, of the Heisman Pose photo slide. The absence of the Heisman Pose slide in the collection that Getty Images returned did not alarm Brian Masck, nor should it have, because Brian Masck had never sent the Heisman Pose photo slide to Allsport. As a matter of fact, looked at in retrospect, its absence, had he considered it, would have reassured Brian that nobody else had one of his images.  At the time, Brian had no knowledge

whatever that Getty possessed either an unauthorized copy of the Heisman Pose photo slide or even so much as an unauthorized print.

85.   On May 2, 2005 Getty Images uploaded the Heisman Pose photograph to its digital asset management system.  The following picture appeared.



*Unlawful and uncredited reproduction of Brian Masck's Desmond Howard Heisman Pose photograph by Getty Images*

86.   In so doing, Getty Images unlawfully reproduced a copy of Brian's Heisman Pose photograph. Getty Images did not credit Brian Masck as the photographer, did not designate him as the entity to be credited, and did not list him as owner of the copyright. Getty Images inaccurately and unlawfully listed "Getty Images/Staff" in the "Photographer" line of the database, inaccurately and unlawfully listed "Getty Images" on the "Credit" line of the database, and inaccurately and unlawfully listed "1991 Getty Images" on the "Copyright" line of the database.

87.   Brian Masck does not know how Getty Images came to possess the photograph, either as a transparency slide or as a print. He had never provided Getty Images with a slide or print of his Heisman Pose photograph.

88.     After May 2, 2005 and at least until September 2, 2011, Getty Images unlawfully sold, for a profit, licenses of Brian Masck's Heisman Pose photograph to customers of Getty Images.

89.     Getty Images did so without providing any credit or compensation to Brian Masck. In its agreements with customers, Getty Images unlawfully licensed the use of the digital file it had unlawfully created of the Heisman Pose photograph. These agreements required customers to pay Getty Images for a one-time use or multiple uses of the image. Some customers used the image to pursue commercial enterprises of their own, whether to sell prints of the image, to create products with the image, to display the image on commercial web sites, to display the image in online, print, or television advertising; or other commercial uses.

90.     In 2005, EA Sports contracted with Brian Masck to license the Heisman Pose photo for use in its video game, *EA Sports NCAA College Football 2006*.

91.     EA Sports paid Brian $8000 to use his photograph in *EA Sports NCAA College Football 2006* and in the packaging and related marketing of this product. EA Sports knew that Brian Masck was the photographer and copyright holder for the Heisman Pose photo and properly credited and compensated him for use of his photograph.

92.     On June 9, 2010 Brian was walking through the Flint, Michigan, Sam's Club Store when he came upon a display including an unauthorized reproduction of his Heisman Pose photo in a grouping of framed athletic memorabilia for sale. This unauthorized reproduction bore the logo of Photo File.



*Example of Brian Masck's Desmond Howard Heisman Pose
photograph with Photo File logo*

93.   Further research showed that Photo File, which describes itself as a "leading manufacturer

of sports photography," had created unauthorized reproductions of Brian Masck's Heisman

Pose photograph. In addition to stock for retail stores, Photo File sold unauthorized

reproductions of Brian Masck's Heisman Pose photograph on its web site. Photo File did

not consult with, credit, or compensate Brian Masck as the photographer and copyright

owner of his photograph. Photo File inaccurately and unlawfully placed its own mark on

Brian's picture.

94.     On October 18, 2010, and again on August 21, 2011, *Sports Illustrated* published an unauthorized full-page reproduction of the Heisman Pose photograph as part of a two-page advertising spread for Nissan automobiles. The 2011 ad appeared in *Sports Illustrated's* college football preview issue. Neither advertisement credited Brian Masck for his Heisman Pose photo, and Brian was never consulted about nor compensated for this use of his photograph.



*Sports Illustrated's unauthorized and uncredited publication of Brian Masck's Desmond Howard Heisman Pose photograph (August 21, 2011 issue)*

95.     On August 15, 2011, Brian discussed the sale of the Desmond Howard Heisman Pose photograph with Desmond Howard's agent, Ward Headley.  Over email, Mr. Headley invited Brian Masck to ballpark a price he would consider for sale of his copyright of the Desmond Howard Heisman Pose photograph.

96.     On August 18, 2011 Brian Masck met Desmond Howard personally, at Howard's request, to discuss both past and future uses of Brian's Heisman Pose photo. During that meeting,

Desmond told Brian that the Heisman Trophy pose is still the thing people ask him about most, even twenty years later. Brian told Desmond the story of creating his photograph. They discussed the sale of Brian Masck's copyright of his Heisman Pose photograph to Desmond Howard.  These talks were incomplete and inconclusive.

97.    Following their face to face meeting, Brian and Desmond continued negotiating the sale of the copyright of the Heisman Pose photograph. Brian Masck proposed a price range between $200,000 and $300,000 for his copyright. Desmond Howard never proposed a figure. Desmond Howard did not purchase Brian Masck's copyright of the Heisman Pose photograph.

98.    On or about August 31, 2011, the United States Copyright Office certified Brian Masck's registration of his Heisman Pose photograph. The United States Copyright Office assigned the photograph registration number VA 1-797-474. The effective registration date of the copyright is August 31, 2011.

99.    On or about September 10, 2011 Champions Press published an unauthorized reproduction of Brian Masck's Heisman Pose photo in a coffee-table-style biography of Desmond Howard, entitled *I Wore 21: The Legend of Desmond Howard.*

100.    Shortly before publication of the book, on August 31, 2011, Brian Masck and Desmond Howard spoke via telephone in a conference call which also included Patrick McCarthy (Brian Masck's counsel at the time) and Richard Hewlett (Desmond Howard and Champions Press's counsel at the time). During the call, Masck asked Howard and Hewlett whether an unauthorized reproduction of Masck's Heisman Pose photo was in the forthcoming book, *I Wore 21*.  Howard and Hewlett declined to compare Masck's Heisman

Pose photograph with the photographs they knew were to be used in *I Wore 21*. When

Masck bought a copy of the by then published book, he found his exact Heisman Pose

photo printed on page 81. Masck was never consulted, asked for, credited, nor

compensated for this use of his photo.



*Unauthorized and uncredited publication of Brian Masck's Desmond Howard Heisman Pose photograph - I Wore 21, page 81*

101.    The home page of Desmond Howard's official web site (*Desmondhoward.com*) contains

an unauthorized reproduction of Brian Masck's Heisman Pose photograph. Desmond

Howard has never credited or compensated Brian Masck for this use of his photograph.



*Desmond Howard's website banner*

102. The biographical information section of Desmond Howard's website also contains an unauthorized reproduction of Brian Masck's Heisman Pose photograph, depicted below.

103. The photograph Desmond Howard used as the source of his image on his website came from Brian Masck in the following way. In 2011, Brian Masck had altered the Heisman Pose photograph ever so slightly, so he could track unauthorized use of his photograph. He added two tells to the photograph. First, he removed the branding from the glove on Desmond Howard's right hand. Second, he extended the lettering on the football. These small alterations do not appear to the untrained eye, but assist Brian Masck in tracking infringing uses of his photograph.

104. In 2012 Brian Masck and Desmond Howard again discussed the sale of Brian Masck's copyright and possible related joint business ventures. One such proposed venture was a joint e-commerce website through which Brian Masck and Desmond Howard would sell signed prints of Brian Masck's Heisman Pose photograph and other premium products related to that iconic photograph. In August 2012, at Howard's request, Brian sent sample prints of the Heisman Pose photograph to Desmond. To protect his copyright of this image, Brian sent prints which contained the tells of infringement, as noted above. Desmond Howard neither purchased the copyright nor did he partner with Brian Masck in any of their discussed joint business ventures. However, Desmond Howard did publish Brian Masck's Heisman Pose photograph with the tells on his website. Desmond Howard did not credit or compensate Brian Masck, nor did he have Brian Masck's permission to so publish Brian's photograph.



*Desmond Howard's unauthorized and uncredited publication of Brian Masck's Heisman Pose photograph located at http://www.desmondhoward.com/bio/college-career. The tells of infringement are identified in red.*

105.   Desmond Howard is expected to soon launch the e-commerce portion of his website, entitled "Desmond's Store." The logo for "Desmond's Store" is a t-shirt with a cartoon image of Brian Masck's Heisman Pose photograph. As Brian writes, "Desmond is following the same business plan I suggested we pursue together . . . only he's doing it on his own site."

106.   Fathead, a company that produces life-size, wall-adhering graphics, also unlawfully published and sold unauthorized copies of Brian Masck's Desmond Howard Heisman Pose photograph. It did so in the form of a "fathead" – a life-size and sometimes other-sized adhesive sticker of Desmond Howard created by copying Brian Masck's Heisman Pose photograph. Fathead did not credit nor compensate Brian Masck for its copying the

Desmond Howard Heisman Pose photograph to create the Desmond Howard fathead.

Instead, Fathead included its own logo with the adhesive image.



*The unlawful and uncredited Desmond Howard Heisman Pose photograph fathead created by Fathead.*

107.   On or about January 9, 2012 *Sports Illustrated* yet again published an unauthorized full-page reproduction of the Heisman Pose photograph as part of a two-page advertising spread for Nissan automobiles. The advertisement did not credit Brian Masck for his Heisman Pose photo, and Brian Masck was never consulted about nor compensated for this use of his photograph.

108.   *Sports Illustrated* has also published Brian Masck's Heisman Pose photograph on its websites SI.com and SIKids.com, without Brian Masck's authorization. *Sports Illustrated* confuses the credit of the photograph by listing "Brian Masck/Getty Images" in the byline.

Brian Masck has not been compensated for this unlawful use of his photograph. He does not know whether Getty Images has been compensated.

109.    On September 21, 2012, Brian Masck informed Amazon.com via e-mail that it was selling unauthorized reproductions of his Heisman Pose photograph, and that through such sales, Amazon.com was infringing on his copyright. As of the date of this Complaint, Amazon.com continues to list for sale unauthorized reproductions of Brian Masck's Heisman Pose photograph. Amazon.com has never consulted with, credited nor compensated Brian Masck for its sale of these products.

110.    As of the date of this Complaint, Walmart continues to sell unauthorized reproductions of Brian Masck's Heisman Pose photograph on its website walmart.com. Walmart has never consulted with, credited nor compensated Brian Masck for these products.

**The Impact of Brian Masck's Heisman Pose Photo in Popular Culture**

111.    Brian Masck's photograph has become an iconic image.

112.    In the 21 years since Brian Masck shot the Heisman Pose photograph, the concept of the "Heisman pose" entered popular consciousness. When Desmond Howard assumed the pose in that 1991 game, his act was an edgy thing to do, not only to be predicting his own win of the Heisman Trophy but to appear to be good-naturedly teasing the Trophy's pose itself. Since then, striking the Heisman pose is a college football player and fan tradition, and the concept has even extended far beyond college football.



*A dog owner strikes the Heisman pose with his dog.*

The Heisman pose has become a celebratory stance, a pose struck by athletes in other sports, a source of humorous parody, and a pose of strength re-purposed in other fields (such as an image of a pastor in the pose with a Bible instead of a football). Even President Barack Obama and First Lady Michelle Obama have been photographed doing the Heisman pose.



*President Obama strikes the Heisman pose.*



*Michelle Obama strikes the Heisman pose.*

113.    In April 2012, more than two decades after Desmond Howard first struck the pose and

Brian Masck took his picture doing it, Adam Jacobi, a football writer for the online sports

magazine *Bleacher Report*, recently revisited the moment in an online post:[3] "That

Heisman pose became one of the most indelible, iconic images of the last few decades of

college football. . . But just how universal has it become? Howard didn't even strike the

pose *correctly,* – the actual Heisman Trophy has both feet down – but it became the pose

everyone does anyway. Look at the Google Image Search for 'Heisman Pose,' and all the

legs up. That's cultural currency."  In other words, people are not recreating the pose of the

actual Trophy; they are recreating Howard's version of the pose, as best captured for the

public's imagination and memory by Brian Masck.

114.    The *Bleacher Report* post includes Brian Masck's photograph (unlawfully uncredited).

Brian Masck's photograph has created the "cultural currency" Jacobi correctly describes.

---

[3]      http://bleacherreport.com/articles/1135607-classic-big-ten-football-ohio-state-at-michigan-1991 (April 6, 2012)

Without this perfect shot, from this particular angle, the concept of the Heisman pose most

likely would never have gained the resonance and cultural momentum it has today.

115. During the 2012 college football season, the Big Ten Conference ran a commercial that

consisted of iconic images of the conference's athletes, both past and present. The Big

Ten's commercial features Brian Masck's Heisman Pose photograph. Even now, more than

two decades after Brian created that photograph, it remains one of the Big Ten's defining

images.

116. While this case was being investigated and evaluated, an unauthorized and uncredited copy

of Brian Masck's Heisman Pose photograph, affixed to a plaque, was even spotted for sale

in a strip mall at the Bread Basket Deli near Ann Arbor. In a small display of local sports

plaques, standing next to the counter where people were ordering corned beef and pastrami

sandwiches, was Brian Masck's career achievement, on sale without his knowledge or

consent, for $19.99. If you can buy his photo at a storefront deli, where can't you buy it?

117. Perhaps it could be argued that if Brian Masck's photograph had not gone viral, it would

not have become an iconic image. But this case is not about a photograph going viral. It

is about getting credit, and the bruising inimical to it.  And yes, it is also about the money

which businesses and individuals that knowingly used and apparently intend to use Brian's

photograph to make for themselves.

### The Impact of Infringement on Brian Masck

118. Brian Masck has suffered grievous harms.

119. Defendants have deprived him of the opportunity to be compensated for his work and for

the iconic image he created.  Each time any of the Defendants make an unauthorized

publication or sale of Brian Masck's Heisman Pose photograph, they deny Brian Masck an opportunity to enjoy the recognition and the financial rewards of his copyrighted creation. For example, every single license agreement to use the photograph that Getty and Photo File have sold to others rightfully belongs only to Brian Masck.

120.  As described, Brian Masck once considered selling the copyright of the photograph to Desmond Howard and teaming with him on various business ventures. But the prevalence of pirated copies of the photograph, due largely in part to the acts of Defendants, including Howard himself, likely prevented Brian from enjoying such a sale and partnership.

121.  Defendants have unjustly gorged themselves on the fruit of Brian Masck's artistic creativity and have deprived him of his share. This iconic photograph increased the visibility of Sports Illustrated's and Nissan's advertisements, it sold Fatheads, and it sold copies of *I Wore 21*. Amazon and Walmart benefitted from sales of the photograph on their web sites and the traffic to their web sites due to their sales of  Brian's photograph. It has increased the visibility of and added cultural currency to Desmond Howard's web site. If the striking of the pose remains the thing that people continue to ask Desmond Howard the most about, then what would *Desmondhoward.com* be without the Heisman Pose photograph? These were all business opportunities that Defendants unjustly deprived Brian Masck from taking part in.

122.  But to only evaluate the harm done to Brian from an economic perspective misses the truest mark. When, in his darkroom at home the Sunday after the game, Brian first saw the image of his Desmond Howard Heisman Pose photograph, he knew he had taken the picture that would define the 1991 college football season. He was proud, and justifiably

so, of his good work. Later that year Sports Illustrated properly credited Brian for the Desmond Howard Heisman Pose photograph which appeared in its December 9, 1991 issue.

123.   Since then, these various intellectual property pirates who are Defendants in this case have taken a business crowbar to that byline and have pried Brian Masck's name away from his iconic photograph. They have separated him from his work. The Heisman pose and Brian's iconic photograph which captured it have both gone viral. The name Brian Masck has not. Defendants have deprived him of the opportunity to be recognized as the author of this iconic photograph. They have denied him credit for his work. This damages Brian Masck's reputation. This hurts Brian personally, causing him enormous distress and frustration.

124.   In fact, walking into Sam's that day near his home was the last straw emotionally, leading Brian to the course which, for lack of any other effective alternative, results in this case.


## COUNT I: COPYRIGHT INFRINGEMENT (Against SI)

125.   Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

126.   Brian Masck has a valid federal copyright registration for the Desmond Howard Heisman Pose Photograph ("Registered Photograph") (Registration #VA 1-797-474), and has exclusive ownership and exclusive rights to use his copyright.

127.   Because SI licensed Brian Masck's Registered Photograph in for use in a December 1991 issue of its printed magazine, SI had access to the Registered Work.

128. SI directly copied the Registered Photograph and published an unauthorized copy of the photograph in the infringing marketing materials in its October 18, 2010 issue. Alternatively, strong similarities probative of copying exist between the Registered Photograph and the infringing marketing materials SI published in its October 18, 2010 issue.

129. SI directly copied the Registered Photograph and published an unauthorized copy of the photograph within the infringing marketing materials in its August 21, 2011 issue. Alternatively, strong similarities probative of copying exist between Brian Masck's Registered Photograph and the infringing marketing materials SI published in its August 21, 2011 issue.

130. SI directly copied Brian Masck's Registered Photograph and published an unauthorized copy of the photograph in the infringing marketing materials in is January 9, 2012 issue. Alternatively, strong similarities probative of copying exist between the Registered Photograph and the infringing marketing materials SI published in its January 9, 2012 issue.

131. Direct evidence of copying, and alternatively, strong similarities probative of copying exist between the Registered Photograph and SI's infringing photograph it has published on its websites *SI.com* and *SIKids.com*.

132. Through its publication of directly copied or substantially similar marketing materials and directly copied photograph, SI has infringed Brian Masck's copyright in the Registered Photograph.

133.   SI has profited from its infringement of Brian Masck's copyright in the Registered Photograph.

134.   SI, through its infringement, has caused Brian Masck to suffer monetary damages and damage to his reputation. Brian Masck has suffered these damages within the United States, the State of Michigan, and internationally.

135.   SI's acts of infringement are not protected through any exceptions of the Copyright Act.

136.   Pursuant to 17 U.S.C. § 502, Brian Masck is entitled to temporary and final injunctive relief to cease SI's infringement of Brian Masck's copyright in the Registered Photograph.

137.   Pursuant to 17 U.S.C. § 503, Brian Masck is entitled to an order impounding all of SI's infringing materials as well all additional items that infringe Brian Masck's copyright in the Registered Photograph.

138.   Pursuant to 17 U.S.C. § 504, Brian Masck, at his election, is entitled to either his actual damages and SI's profits related to SI's infringement, or statutory damages.

139.   Pursuant to 17 U.S.C. § 505, Brian Masck is entitled to costs and attorneys' fees.


**COUNT II: COPYRIGHT INFRINGEMENT (Against Nissan)**

140.   Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

141.   Because Nisan partnered with SI, which had previously licensed the Registered Photograph, to publish the infringing marketing materials, it had access to Brian Masck's Registered Photograph.

142. Nissan directly copied the Registered Photograph and published an unauthorized copy of the photograph of the infringing marketing materials Nissan published in the October 18, 2010 issue of Sports Illustrated. Alternatively, strong similarities probative of copying exist between the Registered Photograph and the infringing marketing materials Nissan published in the October 18, 2010 issue of Sports Illustrated.

143. Nissan directly copied the Registered Photograph and published an unauthorized copy of the photograph of the infringing marketing materials Nissan published in the August 21, 2011 issue of Sports Illustrated. Alternatively, strong similarities probative of copying exist between the Registered Photograph and the infringing marketing materials Nissan published in the August 21, 2011 issue of Sports Illustrated.

144. Nissan directly copied Brian Masck's Registered Photograph and published an unauthorized copy of the photograph of the infringing marketing materials Nissan published in the January 9, 2012 issue of Sports Illustrated, Alternatively, strong similarities probative of copying exist between Brian Masck's Registered Photograph and the infringing marketing materials Nissan published in the January 9, 2012 issue of Sports Illustrated.

145. Through its publication of its directly copied or substantially similar marketing materials,

146. Nissan has infringed Brian Masck's copyright in the Registered Photograph.

147. Nissan has profited from its infringement of Brian Masck's copyright in the Registered Photograph.

148. Nissan, through its infringement, has caused Brian Masck to suffer monetary damages and damage to his reputation. Brian Masck has suffered these damages within the United States, the State of Michigan, and internationally.

149. Nissan's acts of infringement are not protected through any exceptions of the Copyright Act.

150. Pursuant to 17 U.S.C. § 502, Brian Masck is entitled to temporary and final injunctive relief to cease Nissan's infringement of Brian Masck's copyright in the Registered Photograph.

151. Pursuant to 17 U.S.C. § 503, Brian Masck is entitled to an order impounding all of Nissan's infringing materials as well all additional items that infringe Brian Masck's copyright in the Registered Photograph.

152. Pursuant to 17 U.S.C. § 504, Brian Masck, at his election, is entitled to either his actual damages and Nissan's profits related to Nissan's infringement, or statutory damages.

153. Pursuant to 17 U.S.C. § 505, Brian Masck is entitled to costs and attorneys' fees.


**COUNT III: COPYRIGHT INFRINGEMENT (Against Getty)**

154. Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

130. Getty directly copied Brian Masck's Registered Photograph by publishing the Registered Photograph on its website without authorization from Plaintiff. Alternatively, strong similarities probative of copying exist between Getty's image and the Registered Photograph.

131.  Getty sold unauthorized licenses of the Registered Photograph.

132.  Through its publication of the Registered Photograph and its sale of licenses of the Registered Photograph, Getty has infringed Brian Masck's copyright in the Registered Photograph.

133.  Getty has profited from its infringement of Brian Masck's copyright in the Registered Photograph.

134.  Getty, through its infringement, has caused Brian Masck to suffer monetary damages and damage to his reputation. Brian Masck has suffered these damages within the United States, the State of Michigan, and internationally.

135.  Getty's acts of infringement are not protected through any exceptions of the Copyright Act.

136.  Pursuant to 17 U.S.C. § 502, Brian Masck is entitled to temporary and final injunctive relief to cease Getty's infringement of Brian Masck's copyright in the Registered Photograph.

137.  Pursuant to 17 U.S.C. § 503, Brian Masck is entitled to an order impounding all of Getty's infringing materials as well all additional items that infringe Brian Masck's copyright in the Registered Photograph.

138.  Pursuant to 17 U.S.C. § 504, Brian Masck, at his election, is entitled to either his actual damages and Getty's profits related to Getty's infringement, or statutory damages.

139.  Pursuant to 17 U.S.C. § 505, Brian Masck is entitled to costs and attorneys' fees.

## COUNT IV: COPYRIGHT INFRINGEMENT (Against Champions Press)

140.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

141.    Champions Press had access to Brian Masck's Registered Photograph.

142.    Champions Press directly copied Brian Masck's Registered Photograph and published an unauthorized copy of the photograph in its book *I Wore 21*. Alternatively, similarities probative of copying exist between Brian Masck's Registered Photograph and the infringing photograph of Desmond Howard that Champions Press published in its book *I Wore 21*.

143.    Through its publication of the Registered Photograph, Champions Press has infringed Brian Masck's copyright in the Registered Photograph.

144.    Champions Press has profited from its infringement of Brian Masck's copyright in the Registered Photograph.

145.    Champions Press, through its infringement, has caused Brian Masck to suffer monetary damages and damage to his reputation. Brian Masck has suffered these damages within the United States, the State of Michigan, and internationally.

146.    Champions Press's acts of infringement are not protected through any exceptions of the Copyright Act.

147.    Pursuant to 17 U.S.C. § 502, Brian Masck is entitled to temporary and final injunctive relief to cease Champions Press's infringement of Brian Masck's copyright in the Registered Photograph.

148.  Pursuant to 17 U.S.C. § 503, Brian Masck is entitled to an order impounding all of Champions Press's infringing materials as well all additional items that infringe Brian Masck's copyright in the Registered Photograph.

149.  Pursuant to 17 U.S.C. § 504, Brian Masck, at his election, is entitled to either his actual damages and Champions Press's profits related to Champions Press's infringement, or statutory damages.

150.  Pursuant to 17 U.S.C. § 505, Brian Masck is entitled to costs and attorneys' fees.

### COUNT V: COPYRIGHT INFRINGEMENT (Against Desmond Howard)

151.  Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

152.  Desmond Howard had access to Brian Masck's Registered Photograph.

153.  Desmond Howard directly copied the Registered Photograph and published an unauthorized copy of the photograph on his website *Desmondhoward.com*. Alternatively, similarities probative of copying exist between the Registered Photograph and the infringing photograph of Desmond Howard that Desmond Howard published on his website *Desmondhoward.com*.

154.  Through his publication of the Registered Photograph, Desmond Howard has infringed Brian Masck's copyright in the Registered Photograph.

155.  Desmond Howard has profited from his infringement of Brian Masck's copyright in the Registered Photograph.

156.  Desmond Howard, through his infringement, has caused Brian Masck to suffer monetary damages and damage to his reputation. Brian Masck has suffered these damages within the United States, the State of Michigan, and internationally.

157.  Desmond Howard's acts of infringement are not protected through any exceptions of the Copyright Act.

158.  Pursuant to 17 U.S.C. § 502, Brian Masck is entitled to temporary and final injunctive relief to cease Desmond Howard's infringement of Brian Masck's copyright in the Registered Photograph.

159.  Pursuant to 17 U.S.C. § 503, Brian Masck is entitled to an order impounding all of Desmond Howard's infringing materials as well all additional items that infringe Brian Masck's copyright in the Registered Photograph.

160.  Pursuant to 17 U.S.C. § 504, Brian Masck, at his election, is entitled to either his actual damages and Desmond Howard's profits related to Desmond Howard's infringement, or statutory damages.

161.  Pursuant to 17 U.S.C. § 505, Brian Masck is entitled to costs and attorneys' fees.


## COUNT VI: COPYRIGHT INFRINGEMENT (Against Photo File)

162.  Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

163.  Photo File had access to Brian Masck's Registered Photograph.

164.  Photo File directly copied the Registered Photograph, published an unauthorized copy on its website *Photofile.com*, and sold unauthorized copies of the Registered Photograph.

Alternatively, similarities probative of copying existing between Photo File's photograph and the Registered Photograph.

165. Through its publication and sale of the Registered Photograph, Photo File has infringed Brian Masck's copyright in the Registered Photograph.

166. Photo File has profited from its infringement of Brian Masck's copyright in the Registered Photograph.

167. Photo File, through its infringement, has caused Brian Masck to suffer monetary damages and damage to his reputation. Brian Masck has suffered these damages within the United States, the State of Michigan, and internationally.

168. Photo File's acts of infringement are not protected through any exceptions of the Copyright Act.

169. Pursuant to 17 U.S.C. § 502, Brian Masck is entitled to temporary and final injunctive relief to cease Photo File's infringement of Brian Masck's copyright in the Registered Photograph.

170. Pursuant to 17 U.S.C. § 503, Brian Masck is entitled to an order impounding all of Photo File's infringing materials as well all additional items that infringe Brian Masck's copyright in the Registered Photograph.

171. Pursuant to 17 U.S.C. § 504, Brian Masck, at his election, is entitled to either his actual damages and Photo File's profits related to Photo File's infringement, or statutory damages.

172. Pursuant to 17 U.S.C. § 505, Brian Masck is entitled to costs and attorneys' fees.

## **COUNT VII: COPYRIGHT INFRINGEMENT (Against Fathead)**

173.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs

174.    Fathead had access to Brian Masck's Registered Photograph.

175.    Fathead directly copied the Registered Photograph, published an unauthorized copy of the Registered Photograph on its website Fathead.com, and sold unauthorized copies of the Registered Photograph as a fathead.

176.    Alternatively, Fathead created an unauthorized derivative work based on the Registered Photograph, and published and sold copies of the unauthorized derivative work on its website Fathead.com.

177.    Through its publication and sale of the Registered Photograph or the unauthorized derivative work based on the Registered Photograph, Fathead has infringed Brian Masck's copyright in the Registered Photograph.

178.    Fathead has profited from its infringement of Brian Masck's copyright in the Registered Photograph.

179.    Fathead, through its infringement, has caused Brian Masck to suffer monetary damages and damage to his reputation. Brian Masck has suffered these damages within the United States, the State of Michigan, and internationally.

180.    Fathead's acts of infringement are not protected through any exceptions of the Copyright Act.

181. Pursuant to 17 U.S.C. § 502, Brian Masck is entitled to temporary and final injunctive relief to cease Fathead's infringement of Brian Masck's copyright in the Registered Photograph.

182. Pursuant to 17 U.S.C. § 503, Brian Masck is entitled to an order impounding all of Fathead's infringing materials as well all additional items that infringe Brian Masck's copyright in the Registered Photograph.

183. Pursuant to 17 U.S.C. § 504, Brian Masck, at his election, is entitled to either his actual damages and Fathead's profits related to Fathead's infringement, or statutory damages.

184. Pursuant to 17 U.S.C. § 505, Brian Masck is entitled to costs and attorneys' fees.

## COUNT VIII: COPYRIGHT INFRINGEMENT (Against Amazon)

185. Brian Masck incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

186. Amazon has allowed merchants including, but not limited to Authentic Sports Collectibles Inc., AAA Sports Memorabilia LLC, Sports Memorabilia LLC, Athlon Sports Collectibles Inc. to publish for sale and to sell identical or substantially similar copies of Brian Masck's Registered Work.

187. These merchants' publications for sale and sales of identical or substantially similar copies of the Registered Work has infringed Brian Masck's copyright in the Registered Photograph.

188. Amazon has the right and ability to supervise the content of its website *Amazon.com*.

189. Amazon has enjoyed a direct financial benefit from the merchants' infringement of Brian Masck's copyright in the Registered Photo via its website *Amazon.com*.

190. In addition, Amazon received notice from Brian Masck on September 21, 2012 of its infringing actions. Amazon has knowledge of its merchants' infringing actions.

191. As of the drafting of this complaint, Amazon continues to permit merchants to publish infringing copies of the Registered Work for sale on *Amazon.com*.

192. Amazon has materially contributed to the infringing conduct of its merchants by continuing to allow the merchants to publish for sale unauthorized copies of the Registered Photograph.

193. Amazon has profited from its vicarious and contributory infringement of Brian Masck's copyright in the Registered Photograph.

194. Amazon, through its infringement, has caused Brian Masck to suffer monetary damages and damage to his reputation. Brian Masck has suffered these damages within the United States, the State of Michigan, and internationally.

195. Amazon's acts of infringement are not protected through any exceptions of the Copyright Act.

196. Pursuant to 17 U.S.C. § 502, Brian Masck is entitled to temporary and final injunctive relief to cease Amazon's infringement of Brian Masck's copyright in the Registered Photograph.

197. Pursuant to 17 U.S.C. § 503, Brian Masck is entitled to an order impounding all of Amazon's infringing materials as well all additional items that infringe Brian Masck's copyright in the Registered Photograph.

198.    Pursuant to 17 U.S.C. § 504, Brian Masck, at his election, is entitled to either his actual damages and Amazon's profits related to Amazon's infringement, or statutory damages.

199.    Pursuant to 17 U.S.C. § 505, Brian Masck is entitled to costs and attorneys' fees.

## COUNT IX: COPYRIGHT INFRINGEMENT (Against Walmart)

200.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

201.    Walmart has allowed merchants including, but not limited to Pro Team, Inc. to publish for sale and to sell identical or substantially similar copies of Brian Masck's Registered Work.

202.    These merchants' publications for sale and sales of identical or substantially similar copies of the Registered Work has infringed Brian Masck's copyright in the Registered Photograph.

203.    Walmart has the right and ability to supervise the content of its website *Walmart.com*.

204.    Walmart has enjoyed a direct financial benefit from the merchants' infringement of Brian Masck's copyright in the Registered Work via its website *Walmart.com*.

205.    Walmart has profited from its vicarious and contributory infringement of Brian Masck's copyright in the Registered Photograph.

206.    Walmart, through its infringement, has caused Brian Masck to suffer monetary damages and damage to his reputation. Brian Masck has suffered these damages within the United States, the State of Michigan, and internationally.

207.    Walmart's acts of infringement are not protected through any exceptions of the Copyright Act.

208.    Pursuant to 17 U.S.C. § 502, Brian Masck is entitled to temporary and final injunctive relief to cease Walmart's infringement of Brian Masck's copyright in the Registered Photograph.

209.    Pursuant to 17 U.S.C. § 503, Brian Masck is entitled to an order impounding all of Walmart's infringing materials as well all additional items that infringe Brian Masck's copyright in the Registered Photograph.

210.    Pursuant to 17 U.S.C. § 504, Brian Masck, at his election, is entitled to either his actual damages and Walmart's profits related to Walmart's infringement, or statutory damages.

211.    Pursuant to 17 U.S.C. § 505, Brian Masck is entitled to costs and attorneys' fees.


## COUNT X: LANHAM ACT VIOLATION - UNFAIR COMPETITION (Against SI and Nissan)

212.    Brian Masck incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

213.    SI and Nissan, through their marketing materials, have published a direct and identical copy or a substantially similar copy of Brian Masck's Registered Photograph.

214.    SI and Nissan have inaccurately and unlawfully failed to credit Brian Masck as the photographer and copyright owner of the photograph.

215.    SI and Nissan have caused confusion as to the origin of the Registered Photograph by misrepresenting to actual and potential purchasers that the infringing photograph depicted in their marketing materials belongs to either SI or Nissan, or both.

216.   In addition, SI and Nissan have caused actual and potential purchasers to believe that SI and Nissan's use of the infringing and uncredited Registered Photograph is authorized, sponsored or approved by Brian Masck.

217.   Pursuant to 11 U.S.C. § 1125, SI and Nissan have unfairly competed against Brian Masck.

218.   SI and Nissan have profited from such unfair competition.

219.   SI and Nissan, through their unfair competition, have caused Brian Masck to suffer monetary damages and damage to his reputation. Brian Masck has suffered these damages within the United States, the State of Michigan, and internationally.

220.   Pursuant to 11 U.S.C. § 1117, Brian Masck is entitled to damages, SI and Nissan's profits, and the costs of the action.


**COUNT XI: LANHAM ACT VIOLATION - UNFAIR COMPETITION (Against SI)**

221.   Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

222.   SI has published a direct and identical, or substantially similar, copy of Brian Masck's Registered Photograph on its websites *SI.com* and *SIKids.com*.

223.   SI has inaccurately and unlawfully credited Getty Images as the photographer in addition to crediting Brian Masck as the photographer of the Registered Photograph.

224.   SI has caused website viewers to believe that SI's use of the infringing Registered Photograph is authorized, sponsored or approved by Brian Masck.

225.   Pursuant to 11 U.S.C. § 1125, SI has unfairly competed against Brian Masck.

226.   SI has profited from such unfair competition.

227.   SI, through its unfair competition, has caused Brian Masck to suffer monetary damages and damage to his reputation. Brian Masck has suffered these damages within the United States, the State of Michigan, and internationally.

228.   Pursuant to 11 U.S.C. § 1117, Brian Masck is entitled to damages, SI's profits, and the costs of the action.

## COUNT XII: LANHAM ACT VIOLATION - UNFAIR COMPETITION (Against Getty)

229.   Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

230.   Getty has published a direct and identical, or substantially similar, copy of Brian Masck's Registered Photograph and Getty has sold unauthorized licenses of the Registered Photograph.

231.   Getty has caused confusion as to the origin of the Registered Photograph by misrepresenting to actual and potential purchasers that the infringing photograph that it published and sold licenses of belonged to Getty, that an employee of Getty was the photographer, that Getty deserved credit for the photograph, and that Getty is the copyright holder.

232.   In addition, Getty has caused actual and potential purchasers to believe that Getty's use of the infringing and uncredited Registered photograph is authorized, sponsored or approved by Brian Masck.

233.   Pursuant to 11 U.S.C. § 1125, Getty has unfairly competed against Brian Masck.

234.   Getty has profited from such unfair competition.

235. Getty, through its unfair competition, has caused Brian Masck to suffer monetary damages and damage to his reputation. Brian Masck has suffered these damages within the United States, the State of Michigan, and internationally.

236. Pursuant to 11 U.S.C. § 1117, Brian Masck is entitled to damages, Getty's profits, and the costs of the action.

### COUNT XIII: LANHAM ACT VIOLATION - UNFAIR COMPETITION (Against Champions Press)

237. Brian Masck incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

238. Champions Press has published a direct and identical, or alternatively, a substantially similar, copy of the Registered Photograph in its book *I Wore 21*.

239. Champions Press has inaccurately and unlawfully failed to credit Brian Masck as the photographer and copyright owner in *I Wore 21*.

240. Champions Press has sold copies of *I Wore 21* containing the unaccredited Registered Photograph.

241. Champions Press has caused confusion as to the origin of the Registered Photograph by misrepresenting to actual and potential purchasers that it lawfully acquired the infringing photograph depicted in *I Wore 21* through a source other than Brian Masck.

242. In addition, Champions Press has caused actual and potential purchasers to believe that Champions Press's use of the infringing and uncredited Registered Photograph is authorized, sponsored or approved by Brian Masck.

243.   Pursuant to 11 U.S.C. § 1125, Champions Press has unfairly competed against Brian Masck.

244.   Champions Press has profited from such unfair competition.

245.   Champions Press, through its unfair competition, has caused Brian Masck to suffer monetary damages and damage to his reputation. Brian Masck has suffered these damages within the United States, the State of Michigan, and internationally.

246.   Pursuant to 11 U.S.C. § 1117, Brian Masck is entitled to damages, Champions Press's profits, and the costs of the action.

### COUNT 14: LANHAM ACT VIOLATION – UNFAIR COMPETITION (Against Desmond Howard)

247.   Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

248.   Desmond Howard has published a direct and identical, or alternatively, a substantially similar, copy of the Registered Photograph on his web site *Desmondhoward.com*.

249.   Desmond Howard has inaccurately and unlawfully failed to credit Brian Masck as the photographer and copyright owner on his website.

250.   Desmond Howard has caused confusion as to the origin of the Registered Photograph by misrepresenting to web site viewers that the infringing photograph depicted on *Desmondhoward.com* belongs to Desmond Howard.

251.    In addition, Desmond Howard has caused website viewers to believe that his use of the infringing and uncredited Registered Photograph is authorized, sponsored or approved by Brian Masck.

252.    Pursuant to 11 U.S.C. § 1125, Desmond Howard has unfairly competed against Brian Masck.

253.    Desmond Howard has profited from such unfair competition.

254.    Desmond Howard, through his unfair competition, has caused Brian Masck to suffer monetary damages and damage to his reputation. Brian Masck has suffered these damages within the United States, the State of Michigan, and internationally.

255.    Pursuant to 11 U.S.C. § 1117, Brian Masck is entitled to damages, Desmond Howard's profits, and the costs of the action.


### COUNT XV: LANHAM ACT VIOLATION - UNFAIR COMPETITION (Against Photo File)

256.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

257.    Photo File has published for sale and sold direct and identical, or substantially similar, copies of the Registered Photograph on its website *Photofile.com*.

258.    Photo File branded its infringing copies it published for sale and sold with its logo.

259.    Photo File has inaccurately and unlawfully failed to credit Brian Masck as the photographer and copyright owner of the Registered Photograph.

260. Photo File, through the use of its logo, has caused confusion as to the origin of the Registered Photograph by misrepresenting to actual and potential purchasers that the infringing photograph belongs to Photo File.

261. In addition, Photo File has caused actual and potential purchasers to believe that Photo File's use of the infringing and uncredited Registered Photograph is authorized, sponsored or approved by Brian Masck.

262. Pursuant to 11 U.S.C. § 1125, Photo File has unfairly competed against Brian Masck.

263. Photo File has profited from such unfair competition.

264. Photo File through its unfair competition, has caused Brian Masck to suffer monetary damages and damage to his reputation. Brian Masck has suffered these damages within the United States, the State of Michigan, and internationally.

265. Pursuant to 11 U.S.C. § 1117, Brian Masck is entitled to damages, Photo File's profits, and the costs of the action.

### COUNT 16: LANHAM ACT VIOLATION - UNFAIR COMPETITION (Against Fathead)

266. Brian Masck incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

267. Fathead has published for sale and sold direct and identical copies of the Registered Photograph on its website *Fathead.com*. Alternatively, Fathead has published for sale and sold unauthorized derivative works based on the Registered Photograph on its website *Fathead.com*.

268. Fathead branded its infringing copies, or derivative works, it published for sale and sold with its logo.

269. Fathead has inaccurately and unlawfully failed to credit Brian Masck as the photographer and copyright owner of the Registered Photograph.

270. Fathead, through the use of its logo, has caused confusion as to the origin of the Registered Photograph by misrepresenting to actual and potential purchasers that the infringing photograph belongs to Fathead.

271. In addition, Fathead has caused actual and potential purchasers to believe that Fathead's use of the infringing and uncredited Registered Photograph is authorized, sponsored or approved by Brian Masck.

272. Pursuant to 11 U.S.C. § 1125, Fathead has unfairly competed against Brian Masck.

273. Fathead has profited from such unfair competition.

274. Fathead, through its unfair competition, has caused Brian Masck to suffer monetary damages and damage to his reputation. Brian Masck has suffered these damages within the United States, the State of Michigan, and internationally.

275. Pursuant to 11 U.S.C. § 1117, Brian Masck is entitled to damages, Fathead's profits, and the costs of the action.


### COUNT 17: MICHIGAN CONSUMER PROTECTION ACT VIOLATION - UNFAIR COMPETITION (Against SI, Nissan, Getty, Champions Press, Desmond Howard, Photo File, and Fathead)

276. Brian Masck incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

277.   Defendants, and each of them, through their respective copying, publication, sale, and use of own logos, have caused a probability of confusion or misunderstanding as to the source, sponsorship, approval, and certification of Brian Masck's Registered Photograph.

278.   Defendants, and each of them, pursuant to Mich. Comp. Laws § 445.903, have unfairly competed against Brian Masck. Defendants have profited from such unfair competition.

279.   Defendants, and each of them, through their unfair competition, have caused Brian Masck to suffer monetary damages and damage to his reputation. Brian Masck has suffered these damages within the United States, the State of Michigan, and internationally.

280.   Pursuant to Mich. Comp. Laws § 445.911, Brian Masck is entitled to an injunction preventing Defendants, and each of them, from engaging in such unfair competition, his actual damages, and reasonable attorneys' fees.


**COUNT XVIII: TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP**
**(Against Champions Press)**

281.   Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

282.   In discussing the sale of the copyright of the Registered Photograph, Brian Masck and Desmond Howard had a business relationship.

283.   On August 18, 2011 Desmond Howard met Brian Masck and expressed interest in purchasing Brian Masck's copyright of the Registered Photograph.

284.   On August 31, 2011 Brian Masck participated in a conference call with Patrick McCarthy, Desmond Howard, and Richard Hewlett. Patrick McCarthy represented Brian Masck and

Richard Hewlett represented Desmond Howard and Champions Press. Brian expressed his concern that Champions Press was about to publish *I Wore 21* containing the Registered Photograph without purchasing the right to use the Registered Photograph. Desmond Howard and Richard Hewlett declined to compare the Registered Photograph with the pictures to be published in *I Wore 21*.

285. On or about September 10, 2011 Champions Press published an unauthorized reproduction of the Registered Photograph in *I Wore 21*.

286. After the publication of the unauthorized reproduction of the Registered Photograph in *I Wore 21*, Desmond Howard did not purchase Brian Masck's copyright.

287. Champions Press, in acting as publisher for Desmond Howard's biography, *I Wore 21,* and in sharing the same attorney with Desmond Howard, knew of Desmond Howard's interest in purchasing Brian Masck's copyright of the Registered Photograph.

288. Champions Press intended, by publishing an unauthorized reproduction of the Registered Photograph, to interfere with Brian Masck's business relationship with Desmond Howard.

289. Alternatively, Champions Press knew that it was a substantially certain outcome that, by publishing an unauthorized reproduction of the Registered Photograph, it would interfere with Brian Masck's business relationship with Desmond Howard.

290. As a direct and proximate cause of Champions Press's interference, Desmond Howard did not purchase the copyright of the Registered Photograph. Champions Press's interference disrupted Brian Masck's business relationship with Desmond Howard.

291.    Champions Press, through its tortious interference, has caused Brian Masck to suffer monetary damages and damage to his reputation. Brian Masck has suffered these damages within the United States, the State of Michigan, and internationally.

292.    Brian Masck is entitled to his damages resulting from Champions Press's tortious interference with his business relationship with Desmond Howard. Such damages include lost profits that Brian Masck expected to receive as a result of his business relationship with Desmond Howard, the expenses that Brian Masck incurred in anticipating this business relationship, consequential damages caused by the loss of this business relationship, and non-economic damages for emotional distress, mental anguish, and harm to his reputation. Brian Masck has suffered these damages and will continue to suffer them as a consequence of Champions Press's interference with Brian Masck's and Desmond Howard's business relationship.

### **COUNT XIX: UNJUST ENRICHMENT (Against all Defendants)**

293.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

294.    Defendants, and each of them, through their conduct have and continue to be unjustly enriched to the damage and irreparable harm of Brian Masck.

295.    Specifically, Defendants, and each of them, have unjustly enriched themselves by profiting from the copying, publication, and sale of the ill-gotten Registered Photograph, and by receiving the goodwill from holding themselves out as lawful owners and/or dealers of the Registered Photograph. Brian Masck incurred substantial costs in creating such goodwill.

296. Defendants have unjustly enriched themselves to the direct detriment of Brian Masck.

297. As a result of Defendants' unjust enrichment, Brian Masck has suffered both monetary damages and damages to his reputation. Such damages have been incurred within the State of Michigan, the United States, and internationally.

298. Brian Masck is entitled to compensation for Defendants' unjust enrichment.


**COUNT XX: INJUNCTIVE RELIEF (Against all Defendants)**

299. Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs.

300. Brian Masck is the lawful owner of the Registered Photograph.

301. Without an injunction, Brian Masck reasonably believes that Defendants will continue to copy, publish, publish for sale, and sell inferior and unauthorized photographs that the consuming public will wrongly believe are associated with Brian Masck. In addition, without an injunction, Brian Masck reasonably believes that Defendants will continue to infringe, in the above mentioned manners, on his copyright in the Registered Photograph.

302. Brian Masck will suffer irreparable harm if Defendants are not enjoined from copying, publishing, publishing for sale, and selling their infringing photographs.

303. Brian Masck enjoys a substantial likelihood of success that he will prevail on the merits of his claims against the Defendants.

304. The balancing of the harms favors Brian Masck and the granting of the injunction. Defendants acts continue to cause substantial and irreparable harm as the Registered Photograph further permeates the internet and the public consciousness without

remuneration or credit to Brian Masck. This far outweighs what little harm Defendants will incur from being prohibited from infringing Brian Masck's copyright and/or unfairly competing against him.

WHEREFORE, Brian Masck prays for the following relief:

A.   Preliminary injunctive relief immediately enjoining all Defendants from the copying, publishing, publishing for sale, and selling infringing photographs or materials that contain an infringing photograph, pursuant to 17 U.S.C. § 502 and 11 U.S.C. § 1116;

B.   That Judgment be entered finding all Defendants liable for copyright infringement pursuant to 17 U.S.C. § 501;

C.   That Judgment be entered in favor of Brian Masck in all respects, and that pursuant to 17 U.S.C. § 502, a permanent injunction be issued enjoining all Defendants from copying, reproducing, distributing, publishing, publishing for sale, selling, preparing derivative works or otherwise using the Registered Photograph, without Brian Masck's consent;

D.   That said Judgment includes, pursuant to 17 U.S.C. § 503, that all materials that infringe Brian Masck's copyright in the Registered Photograph be impounded for Brian Masck;

E.   That all Defendants, jointly and severally, pursuant to 17 U.S.C. § 504, recompense Brian Masck for actual damages or statutory damages, whichever is higher, for all damages suffered by Brian Masck, both within the United States and internationally, and Defendants' profits, related to Defendants' copyright infringement;

F.   That all Defendants, jointly and severally, pursuant to 17 U.S.C. §505, recompense Brian Masck for all costs and attorneys' fees incurred in this action;

G.   That Judgment be entered finding defendants SI, Nissan, Getty, Champions Press, Desmond Howard, Photo File, and Fathead liable for unfair competition, pursuant to 11 U.S.C. § 1125;

H.   That said Judgment includes that, pursuant to 11 U.S.C. §1116, a permanent injunction shall issue enjoining defendants SI, Nissan, Getty, Champions Press, Desmond Howard, Photo File, and Fathead from unfairly competing against Brian Masck;

I.   That said Judgment includes that defendants SI, Nissan, Getty, Champions Press, Desmond Howard, Photo File, and Fathead pursuant to 11 U.S.C. § 1117, shall recompense Brian his damages, their profits, and the costs of this action;

J.   That Judgment be entered finding defendants SI, Nissan, Getty, Champions Press, Desmond Howard, Photo File, and Fathead liable for violation of the Michigan Consumer Protection Act, pursuant to Mich. Comp. Laws § 445.903;

K.   That said Judgment includes that, pursuant to Mich. Comp. Laws § 445.911, a permanent injunction shall issue enjoining SI, Nissan, Getty, Champions Press, Desmond Howard, Photo File, and Fathead from engaging in any practices that violate the Michigan Consumer Protection Act with regard to Brian Masck, and that all defendants shall recompense Brian Masck's actual damages together with reasonable attorneys' fees;

L.    That Judgment be entered finding Champions Press liable for tortious interference with a business relationship;

M.    That said Judgment includes that Champions Press shall recompense Brian Masck's damages for all injuries resulting directly from Champions Press's tortious interference; and

N.    Any and all further relief, both legal and equitable against each and all Defendants, that this Court may deem just and proper.

Dated: January 17, 2013                          ___ /s/ Thomas H. Blaske ___
                                                          Thomas H. Blaske (P26760)
                                                          John F. Turck IV (P67670)
                                                          BLASKE & BLASKE, P.L.C.
                                                            Attorneys for Plaintiff
                                                            500 South Main Street
                                                            Ann Arbor, Michigan 48104
                                                            (734) 747-7055

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: January 17, 2013                          ___ /s/ Thomas H. Blaske ___
                                                          Thomas H. Blaske (P26760)
                                                          John F. Turck IV (P67670)
                                                          BLASKE & BLASKE, P.L.C.
                                                        Attorneys for Plaintiff
                                                          500 South Main Street
                                                          Ann Arbor, Michigan 48104
                                                          (734) 747-7055